UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Tarsha Shanta Allgood, *Plaintiff*, v. CNA International, Inc., *Defendant.* | No. 23 CV 462<br><br>Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

While preparing a roast in her Magic Chef 7-in-1 Multicooker, Tarsha Allgood was injured when the device's lid opened causing its "scalding hot contents to be forcefully ejected from the pressure cooker." [Dkt. 79.][1] Allgood filed this lawsuit against CNA International, Inc. d/b/a MC Appliance Corporation raising claims under North Carolina law for inadequate warning, inadequate design, common law negligence, breach of express warranty, and breach of implied warranty. [*Id.*] CNA has moved for summary judgment on all claims. [Dkt. 92.] The motion is granted in part and denied in part. There are no genuine issues of material fact as to Allgood's product liability and warranty claims, but her common law negligence claim (Count Three) remains for trial.

**I.    Background**

The court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed except where otherwise noted. [Dkt. 108, Dkt. 111.] The court views the record in the light most favorable to Allgood as the nonmovant. *See Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023).

Tarsha Allgood, a resident of North Carolina, received a Magic Chef Multicooker as a gift from her now deceased cousin, Jenell Evans, in December 2019. Because the device was a gift, Allgood is unaware of the circumstances surrounding the purchase of the multicooker. [Dkt. 111, ¶¶ 65, 90.] Allgood herself had never seen advertisements or promotional materials for the multicooker before using it. [*Id.*, ¶ 92.] According to Allgood, she used the device monthly after receiving it. [*Id.*, ¶ 65.]

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

CNA imports, markets, distributes, and sells several consumer kitchen goods, including the Magic Chef Multicooker. [*Id.*, ¶¶ 7, 11.] The multicooker is produced by Midea Electric Trading, a company based in Singapore. [Dkt. 26-1; Dkt. 108, ¶ 4.] Midea "packaged [the pressure cookers] in color boxes featuring the Magic Chef branding, which were then sealed inside protective brown carton boxes for shipping." [Dkt. 111, ¶ 13.]² It is undisputed that CNA did not open these boxes before redistributing them to retailers. [*Id.*, ¶ 14.]

Midea "affixed the Magic Chef logo and model number on the Multicooker" and "customized the control panel to match CNA's specifications." [Dkt. 111, ¶ 12.] According to CNA, any modifications that Midea made to the control panel for CNA were "superficial aesthetic" changes for things like adjustments to the font and color of the control panel. [Dkt. 93, ¶ 10.] CNA maintains that "[n]one of the changes affected the functionality of the Multicooker." [*Id.*] Because Allgood has not disputed these statements about CNA's involvement in producing the multicooker by citing supporting evidence that refutes these facts, they are deemed admitted, *supra* n.2. [Dkt. 111, ¶¶ 8, 13.]

Midea drafted the multicooker's user manual, and CNA made formatting adjustments "to include the Magic Chef branding." [*Id.*, ¶ 23.] The user manual included various safety warnings under headings like "Important Safety Instructions," "Safety Features," and "Operation Instructions." [Dkt. 111, ¶ 16.] The relevant warnings read as follows:

---

² "On summary judgment, the court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires the moving party to file a statement of material facts with citations to specific supporting evidence in the record. L.R. 56.1(a)(2); *see also* L.R. 56.1(d). The opposing party must then respond to each fact by either admitting it or disputing it with its own supporting evidence. L.R. 56.1(b)(2); *see also* L.R. 56.1(e). The non-moving party may also file additional facts supporting its position. L.R. 56.1(b)(3). Allgood frequently and improperly attempts to dispute asserted facts by arguing that a statement is disputed to the extent it implies CNA may not be held liable under North Carolina law. [*See e.g.*, Dkt. 111, ¶¶ 8, 12, 13, 14, 23.] This fails to properly dispute a fact, so those facts are deemed admitted. L.R. 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."); *Keeton v. Morningstar*, Inc., 667 F.3d 877, 884 (7th Cir. 2012) (where that party has failed to create a genuine dispute, the fact is deemed admitted).

**IMPORTANT SAFETY INSTRUCTIONS**

5. "DO NOT open the multicooker until the unit has cooled and all internal pressure has been released. If the handle is difficult to slide open, this indicates that the cooker is still pressurized – **DO NOT** FORCE OPEN. Any pressure in the cooker can be hazardous. [Dkt. 111, ¶ 16; Dkt 102-1 at 24.]

34. After cooking, use extreme caution when opening the lid. **ALWAYS** open the lid away from you to avoid skin contact with any heat or steam. Serious burns can result from steam inside the unit. [*Id.* at 25.]

\* \* \*

SAFETY FEATURES

f. Open and Close Lid Safety Device: If there is pressure inside the cooker, then the lid will be set to the lock position to prevent opening. [Dkt. 111, ¶ 16; Dkt. 102-1 at 30.]
g. Micro Switch for Open Guard: Only when the lid is closed properly, will the pressure begin to generate. [Dkt. 111, ¶ 89; Dkt. 102-1 at 30.]

\* \* \*

**OPERATING INSTRUCTIONS**

LID OPENING

1. Before opening the lid, make sure the multicooker has finished cooking. If the cooking program is still on, then press the "Cancel" button to stop it.
**WARNING: DO NOT** open the multicooker until the unit has cooled and all internal pressure has been released. If the handle is difficult to slide open, this indicates that the cooker is still pressurized. **DO NOT** force open. Any pressure in the cooker can be hazardous." [Dkt. 111, ¶ 16; Dkt. 102-1 at 32.]

3

Prior to using the device, Allgood read the user's manual. [Dkt. 111, ¶ 68.] It is undisputed that Allgood understood that opening the pressure cooker before all the pressure had released from the cooker was hazardous and she knew that "if the silver float valve was in the 'up' position or if she could feel resistance when turning the handle, there was pressure inside the Multicooker." [*Id.*, ¶¶ 69–70.]³

In February 2021, Allgood was preparing a roast in the multicooker, which required about two hours of cooking time. [*Id.*, ¶¶ 71–72.] She used the multicooker on the "Natural Release Method" setting, which would give the multicooker thirty minutes to release pressure. [*Id.*, ¶ 73.] When Allgood attempted to open the multicooker two and a half hours later, the silver float valve was in the down position, indicating that there was no pressure inside the cooker. [*Id.*, ¶¶ 73, 75.] Allgood admits that the float valve was in the "down" position but disputes this statement insofar as Allgood testified that when she removed the lid, "pressure exploded" onto her chest. [*Id.*] Allgood testified that she was standing three to four inches from the multicooker when she twisted the lid and, feeling no resistance, lifted it straight up about two inches, at which point steam hit her in the chest. [*Id.*, ¶¶ 77–79.] Immediately as the steam released, Allgood "backed up and used both hands and pushed [the multicooker] off of the counter." [*Id.*] There is no dispute that "if this had been a pressurized event," in addition to steam, water or food or both would have been forcefully expelled from the inner pot of the cooker. [*Id.*, ¶ 83.]

Following this event, Allgood threw away the multicooker's lid. [*Id.*, ¶ 81.] To replicate the relevant events, both parties' experts obtained exemplars of the multicooker for testing. [*Id.*, ¶¶ 45, 93.]

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent*

---

³ In response to CNA's statement of fact ¶ 69, Allgood asserts that her general understanding about the hazards of prematurely opening the pressure cooker is disputed because it is "inconsistent with…the preceding statement ¶ 69." This statement makes no sense, and in an event, it is Allgood's obligation to direct the court precisely to evidence that contradicts an asserted fact, which she did not do. The statement at ¶ 69 is deemed admitted.

4

*Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The court construes the evidence in the light most favorable to the non-moving party, giving him the benefit of all reasonable inferences. *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 911 (7th Cir. 2022). Defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

### III. Analysis

In her First Amended Complaint, Allgood brings claims for inadequate warning or instruction and inadequate design or formulation under N.C. Gen. Stat. § 99B-1, *et seq*. (Counts One and Two); common law negligence (Count Three); breach of express warranty (Count Four); and breach of implied warranty of merchantability under N.C. Gen. Stat. § 25–1–101 *et seq*. (Count Five). [Dkt. 79.] The court addresses each claim below.

#### A. Inadequate Design

Section 99B-6(a) provides that "no manufacturer of a product shall be held liable in any product liability action for the inadequate design or formulation of the product unless the claimant proves that at the time of its manufacture the manufacturer acted unreasonably in designing or formulating the product." N.C.G.S. § 99B-6(a). To maintain a defective design claim in North Carolina, a plaintiff must show either (1) "At the time the product left the control of the manufacturer, the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design," or (2) "At the time the product left the control of the manufacturer, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." N.C.G.S. § 99B-6(a).

CNA argues that it is not liable for Allgood's defective design claim because an inadequate design claim applies to manufacturers, not distributors. More specifically, CNA maintains that its role was "strictly limited to that of a distributor" and it did not design, manufacture, or alter the multicooker. [Dkt. 98 at 11–12; Dkt. 109 at 4.] In support, CNA emphasizes that it is undisputed that the multicooker was packaged by Midea in sealed boxes and shipped directly to CNA's warehouse; that CNA did not open or alter the sealed boxes; and that CNA sold the multicookers it ordered from Midea to third-party retailers, not consumers or end-users. [Dkt. 98 at 12.] This, it says, means that no reasonable jury could find liability under § 99B-6(a).

By its terms, § 99B-6(a) applies only to a manufacturer. § 99B-6(a) ("No manufacturer of a product shall be held liable...") Section 99B-1 defines

"manufacturer" as "a person or entity who designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of a product prior to its sale to a user or consumer. . . ." N.C.G.S. § 99B-1(2). A "seller," on the other hand, includes "a retailer, wholesaler, or *distributor*, and means any individual or entity engaged in the business of selling a product, whether such sale is for resale or for use or consumption." *Id*. § 99B-1(4) (emphasis added).

A showing that a defendant is not the product's manufacturer "reasonably moots [a plaintiff's] defective design claim." *Sparks v. Oxy-Health, LLC*, 134 F. Supp. 3d 961, 978–81 (E.D.N.C. 2015). Courts applying North Carolina law have held that mere sellers, including those who add only finishing touches to a product, are not manufacturers within the meaning of § 99B-1. *See Eakins v. Pella Corp.*, 455 F. Supp. 2d 450, 451 n.1 (E.D.N.C. 2006) ("Admittedly, Pella Carolina performs certain 'late point, value added' functions like mulling Pella windows… [h]owever, Plaintiffs have alleged no facts to conclude that mulling, or any portion of the late-point functions Pella Carolina performs, led to defects alleged here."); *Kiser v. Tractor Supply Co.*, 2013 WL 1623609, at *5 (W.D.N.C. Apr. 15, 2013) (summary judgment warranted on plaintiff's negligent design claim where there was no evidence that defendant manufactured or designed the bucket at issue.); *Morrison v. Sears, Roebuck & Co.*, 341 S.E.2d 40, 41 (1986), *rev'd on other grounds*, 354 S.E.2d 495 (1987) (explaining that Sears was the seller and not the manufacturer of a shoe for § 99B-1 purposes; "We note that the imprinting of Sears' trademark in the shoe does not make Sears the manufacturer of the shoe.")

Allgood does not meaningfully engage with this argument. In her opposition brief, she cites paragraphs from the declaration of Tim Shin, CNA's director of sourcing, including his description of how the multicookers are packaged, sealed, shipped and delivered to CNA and third-party retailers. [Dkt. 102 at 1; Dkt. 108, ¶ 1; Dkt. 93, ¶¶ 11–15 (averring that the multicookers were delivered to CNA in prepackaged, sealed boxes and that opening the boxes would have rendered the product used; also that any changes to the logo were superficial with no impact on functionality).] But these statements only prove the point that CNA is not the manufacturer. And the main case Allgood cites, *KeraLink Int'l, Inc. v. Geri-Care Pharms. Corp.*, 60 F.4th 175, 182 (4th Cir. 2023), involved application of Maryland law, not the North Carolina statutory provision at issue here. [Dkt. 102 at 1.]

The court agrees with CNA that under North Carolina law, it does not meet the definition of manufacturer, and no reasonable jury could conclude otherwise. There is no evidence that CNA "designs, assembles, fabricates, produces, constructs

6

or otherwise prepares a product or component part of a product prior to its sale to a user or consumer." § 99B-1(2)(a). Allgood admits or has otherwise failed to dispute the limits of CNA's role vis-à-vis Midea. [Dkt. 111, ¶¶ 7–8, 13–14.] She advances no evidence or argument that would allow a jury to reasonably conclude that CNA was the manufacturer. *Sparks*, 134 F.Supp.3d at 982 ("defendant performed no action that involved the 'fitting' of component parts together as one unified product prior to shipment. Rather, the evidence indicates that defendant merely repackaged multiple products into one box. Accordingly, defendant did not "otherwise prepare" the chamber, within the meaning of that phrase, and is not the 'manufacturer.'") On this record, summary judgment is granted as to Count One.[4]

### B.  Failure to Warn Claims

Section 99B-5(a) provides that:

No manufacturer or seller of a product shall be held liable in any product liability action for a claim based upon inadequate warning or instruction unless the claimant proves that the manufacturer or seller acted unreasonably in failing to provide such warning or instruction, [and] that the failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought.

N.C.G.S. § 99B-5(a).

In addition, a plaintiff also must prove either that at the time the product left the manufacturer's or seller's control, or after that time, "the product, without an adequate warning or instruction, created an unreasonably dangerous condition that the manufacturer or seller knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm to a reasonably foreseeable" user. *Id.* § 99B-5(a)(1)(2).

---

[4]  The parties briefs are both unhelpful and undeveloped regarding application of North Carolina's "sealed container defense" codified in § 99B-2(a). The court's research suggests that a seller may raise a § 99B-2(a) defense to a product liability actions arising from a breach of implied warranty claim. *Morrison*, 354 S.E.2d at 499. CNA cites this subsection in its arguments opposing Allgood's design defect and inadequate warning claims, *see* dkt. 98 at 12. Allgood ignores the fact that the manufacturer, Midea Electric Trading, is subject to this court's jurisdiction under the Master Purchase Agreement between CNA and Midea Electric. [Dkt. 108, ¶ 5.] The court need not resolve the § 99B-2(a) defense because Allgood's product liability claims fail for other reasons.

7

Failure to warn claims under North Carolina law, "whether rooted in negligence or products liability, require the plaintiff to establish that the defendant owed the plaintiff a 'duty to warn of danger, the nonperformance of which will, when it is the proximate cause of injury, give rise to liability.'" *Lightfoot v. Georgia-Pac. Wood Prods., LLC*, 5 F.4th 484, 488–89 (4th Cir. 2021) (quoting *Stegall v. Catawba Oil Co. of N.C.*, 133 S.E.2d 138, 142 (N.C. 1963) and citing § 99B-5(a)). A duty to warn is imposed on a manufacturer or seller when it has either "actual or constructive knowledge" of a product's danger. *Id.* North Carolina law disfavors stacking inferences to find liability, including in the failure to warn context. *See Snoznik v. Jeld-Wen, Inc.*, 2010 WL 1924483, at *24 (W.D.N.C. May 12, 2010).

All agree that the user manual included several safety warnings relevant to the events of February 2021. Among others, the "important safety instructions" section advises: "34. After cooking, use extreme caution when opening the lid. ALWAYS open the lid away from you to avoid skin contact with any heat or steam. Serious burns can result from steam inside the unit." [Dkt. 111, ¶ 16.] Regarding opening the lid, the "Operating Instructions" section states "WARNING: DO NOT open the multicooker until the unit has cooled and all internal pressure has been released. If the handle is difficult to open, this indicates that the cooker is still pressurized. DO NOT force open. Any pressure in the cooker can be hazardous." [*Id.*]

CNA argues that these instructions and warnings "clearly identify that forcing the Multicooker open when pressurized presents a hazard[] and provides the user with clear instructions for how to safely open the Multicooker after all pressure has been released." [Dkt. 98 at 9.] For her part, Allgood says that the user manual contains "contradictory" warnings that render other warnings inadequate. [Dkt. 102 at 12–13.] In support, she points to the "safety features" section of the user manual, which states: "f. Open and Close Lid Safety Device: If there is pressure inside the cooker, then the lid will be set to the lock position to prevent opening." [*Id.*] Allgood characterizes these statements as contradictory, arguing that a jury might find she was not adequately warned. [*Id.*]

The court does not agree. First, Allgood does not seriously suggest that the language CNA identifies did not adequately warn users of the dangers associated with pressure that builds inside the device. The manual states that users should not open the multicooker until "all internal pressure has been released," and that this is signified by a handle that is difficult to slide open. In that case, the "the cooker is still pressurized – DO NOT FORCE OPEN. Any pressure in the cooker can be hazardous." [Dkt. 111, ¶ 16.] This information is repeated in the operating instructions under "Lid

8

Opening." That section states that before opening, users should "make sure the multicooker has finished cooking," and "WARNING: DO NOT open the multicooker until the unit has cooled and all internal pressure has been released. If the handle is difficult to open, this indicates that the cooker is still pressurized. DO NOT force open. Any pressure in the cooker can be hazardous." [*Id.*, Dkt. 102-1 at 32.] There is no dispute that Allgood read the manual before using the device. [Dkt. 111, ¶ 68.]

Allgood's half-hearted argument that the manual contains contradictory language—"If there is pressure inside the cooker, then the lid will be set to the lock position to prevent opening"— falls flat. Most fundamentally, she does not explain *how* this statement or any other information in the manual is contradictory, or spell out a chain of reasoning explaining the way that a fact finder might do so. Nothing about the statement "if there is pressure inside the cooker, then the lid will be set to the lock position" is plainly inconsistent with the statement that users should not open the device until all internal pressure has released and that difficulty opening the handle indicates pressurization. The manual also expressly states "any pressure in the cooker can be hazardous." [Dkt. 111, ¶ 16; Dkt. 102-1 at 24, 32.] If there is some inconsistency, Allgood certainly has not explained it. It is not the court's role to take facts supplied by the parties and transform them into compelling arguments to defeat summary judgment. *Lane v. Structural Iron Workers Local No. 1 Pension Trust Fund*, 74 F.4th 445, 452–53 (7th Cir. 2023) (litigants are "best positioned and best motivated to provide more information in support of [their] claim."); *Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006) ("Underinclusive and skeletal presentations impermissibly shift the responsibility to the court to do the lawyer's work and to explicate the arguments that the briefs have left undeveloped"; "it is not a judge's responsibility to research and construct the parties' arguments.")

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver*, 3 F.4th at 938 (quoting *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020)). Here, Allgood fails to do so, so summary judgment on the failure to warn claim is granted.

C. **Breach of Express Warranty**

Under § 25-2-313, a seller creates an express warranty through "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise" and "[a]ny description of the

9

goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." § 25-2-313. A breach of express warranty claims requires a plaintiff to prove: "(1) an express warranty as to a fact or promise relating to the goods, (2) which was relied upon by the plaintiff in making his decision to purchase, (3) and that this express warranty was breached by the defendant." *Harbor Point Homeowners' Ass'n, Inc. ex rel. Bd. of Dirs. v. DJF Enters., Inc.*, 697 S.E.2d 439, 447 (N.C. 2010) (quoting *Hall v. T.L. Kemp Jewelry, Inc.*, 322 S.E.2d 7, 10 (N.C. 1984)). To recover damages for a breach, a plaintiff must show that the breach proximately caused the loss sustained. *City of High Point v. Suez Treatment Sols., Inc.*, 485 F. Supp. 3d 608, 627 (M.D.N.C. 2020).

In her amended complaint, Allgood alleges that CNA "expressly warranted that the lid of the pressure cooker could not be removed while the unit remained pressurized." [Dkt. 79, ¶ 63.] She lists the following three statements as the basis of this claim:

- "If the handle is difficult to slide open, this indicates that the cooker is still pressurized"
- "Open and Close Lid Safety Device: If there is pressure inside the cooker, then the lid will be set to the lock position to prevent opening."
- "Micro Switch for Open Guard: Only when the lid is closed properly, will the pressure begin to generate."

[*Id.*]

CNA argues that Allgood has failed to establish the second element, reliance, which is necessary to prevail on an express warranty claim. [Dkt. 98 at 13–14.] The court agrees. First, there is no evidence from which a jury could conclude that Allgood herself relied on any express statement in connection with the purchase. This is because it is undisputed that Allgood did not purchase the multicooker; Jenell Evans gave it to Allgood as a gift. "A seller is bound by an express warranty when, and only when, it is made to induce a sale and does induce such sale." *Hollenbeck v. Ramset Fasteners, Inc.*, 148 S.E.2d 287, 289 (N.C. 1966). Here, no reasonable jury could conclude that statements in the user manual induced the sale because there is no evidence that Allgood knew of or read the manual at the time the multicooker was purchased. Put differently, nothing in the user manual could have formed the basis of the bargain. *See, e.g., Jones v. Clark*, 244 S.E.2d 183, 185–86 (1978) (seal of approval, attached to a product after contract was made, did not become a part of the basis of the bargain); *Yancey v. Remington Arms Co.*, LLC, 2013 WL 5462205, at *3

10

(M.D.N.C. Sept. 30, 2013) (recommending dismissal of breach of express warrant claims because "Plaintiffs have failed to allege any facts showing that they knew of or relied on Remington's express warranty prior to purchasing their rifles;" "general statements about Remington's commitment to safety and quality" were insufficient).

Second and more problematic, Allgood admits that she "could not testify where the Multicooker was purchased *or by whom*." [Dkt. 111, ¶¶ 65 (emphasis added), 90.] Simply put, Allgood has not pointed to any evidence in the record from which a jury could conclude that Evans purchased the multicooker, let alone any evidence suggesting that Evans relied on representations by CNA in making the decision to purchase the multicooker. Though Allgood argues that the multicooker "was purchased by *Plaintiff's cousin*, Jennell Evans as gift," *see* dkt. 102 at 14 (emphasis in original), the evidence Allgood cites to does not support the assertion that Evans was the purchaser. [Dkt. 111, ¶ 65.] It only supports the assertion that Evans gave it to Allgood as a gift. [*Id.*]

Allgood resists this conclusion, arguing that her continued "use of the pressure cooker after reading the manual is proof of her reliance." [Dkt. 102 at 13.] But courts interpreting § 25-2-314 are clear that reliance is measured based on what "was relied upon by the plaintiff *in making his decision to purchase*." *Harbor Point*, 697 S.E.2d at 447 (emphasis added); *Presnell v. Snap-On Securecorp, Inc.*, 583 F. Supp. 3d 702, 710 (M.D.N.C. 2022); *Diop v. BMW of N. Am., LLC*, 511 F. Supp. 3d 679, 686 (E.D.N.C. 2021). Allgood's arguments aimed at her own reliance long after the time of purchase are unpersuasive. She cites no case that supports her position, nor has she pointed to evidence showing that statements in the user manual about (a) difficulty opening the handle as an indicator of pressurization, (b) the lock feature as a way to prevent opening, or (c) how pressure begins to generate, induced *whoever* bought the multicooker to make the purchase. Because there is no evidence from which a jury could reasonably conclude reliance, Allgood's arguments fail.

This is true even though North Carolina law removes the privity requirement in personal injury cases for express or implied warranties against a seller in certain circumstances. "A seller's warranty whether express or implied extends to natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods." § 25–2–318; *Johnson v. Smith & Nephew, Inc.*, 621 F. Supp. 3d 593, 598 (W.D.N.C. 2022) ("when the buyer is in privity of contract with the seller, any express or implied warranties made to the buyer inure to the benefit of the buyer's family or

11

household guests.") This statutory privity exception does not apply here because the identity of the buyer is unknown. [Dkt. 111, ¶¶ 65, 90.]

North Carolina's "judicial privity exception" is also inapplicable. This exception "tends to uphold a privity exception for buyers when the manufacturer intends its warranties to be conveyed to a buyer through the retailer." *Johnson*, 621 F. Supp. 3d at 599 (citing *Kinlaw v. Long Mfg. N. C., Inc.*, 259 S.E.2d 552, 556 (N.C. 1979) ("[A] manufacturer can extend a warranty beyond the bounds of privity if he makes representations designed to induce a purchase and directed to the ultimate purchaser.") Inferring reliance "normally occurs when a manufacturer advertises, labels, or provides manuals with its products with the intention of inducing the ultimate purchaser to buy the product from a retailer." *Johnson,* 621 F. Supp. 3d at 598. The court in *Kinlaw* removed the privity requirement when a buyer bought a tractor from a retailer, where the tractor came with a manual from the manufacturer warranting that the tractor would be free from defects. 259 S.E.2d at 556–57.

Allgood's claim that the judicial privity exception in *Kinlaw* applies here lacks merit. In *Bernick v. Jurden*, the North Carolina Supreme Court reiterated that the element of reliance "can often be inferred from allegations of mere purchase or use if the natural tendency of the representations made is such as to induce such purchase or use." 293 S.E.2d 405, 413 (N.C. 1982). Inferred privity applied because the manufacturer of a mouthguard "promoted their product through hockey catalog advertisements and parent guides" as providing "maximum protection to the lips and teeth." *Id.* at 413–14. "Without a doubt, the natural tendency of a representation of 'maximum protection to the lips and teeth' is such as to induce the purchase of a hockey mouthguard by a mother for her son's use while playing." *Id.*

Here, Allgood points to her deposition testimony that "prior to the incident she read the multicooker user manual", including the "contradictory warnings," as "sufficient evidence of a warranty." [Dkt. 102 at 13–14.] This barebones, undeveloped argument won't do. *Weaver*, 3 F.4th at 938; *Lane*, 74 F.4th at 452. Even with all reasonable inferences are drawn in her favor, statements in the user manual about the safety of the multicooker, including its safety features, stands in stark contrast to the representation at issue in *Bernick*. Simply put, Allgood has not said how any express warranty in the manual had a "natural tendency" to promote purchase akin to the mouthguard advertisement in *Bernick*.

Without evidence of reliance—even inferred reliance—as required under North Carolina law, summary judgment for CNA on the express warranty claim is granted.

12

### D. Breach of Implied Warranty

"'[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.C.G.S. § 25-2-314(1). Merchantable goods "are fit for the ordinary purposes for which such goods are used." *Id.* § 25-2-314(2)(c).

Allgood alleges that "Defendant warranted that its Pressure Cookers were merchantable and fit for the ordinary purpose of safely cooking." [Dkt. 79, ¶ 71.] It is undisputed that Allgood safely used the multicooker monthly over the course of fourteen months. [Dkt. 111, ¶ 65.] According to her deposition testimony, she used the multicooker for the same purpose the day her injuries occurred. [Dkt. 95 at 133–34, 136–39.]

CNA argues that Allgood's implied warranty claim fails for much the same reason as her express warranty claim fails—privity is required to maintain a suit for breach of implied warranty, which Allgood cannot show. [Dkt. 98 at 14.] As discussed above, generally a plaintiff must have contractual privity with a defendant to bring a breach of warranty claim. *Johnson*, 621 F. Supp. 3d at 598; *Nicholson v. American Safety Utility Corp.*, 476 S.E.2d 672, 678 (N.C. Ct. App. 1996) (under North Carolina law, "privity via a contractual relationship between the plaintiff and the seller or manufacturer of an allegedly defective product is required to maintain a suit for breach of implied warranty, 'except where the barrier of privity has been legislatively or judicially removed.'" (quoting *Crews v. W. A. Brown & Son, Inc.*, 416 S.E.2d 924, 929 (N.C. Ct. App. 1992))).

Allgood's only argument in response fails. She maintains that § 99B-2(b) eliminates the privity requirement where a claimant "is a buyer [] of the product involved, or ... is a member or a guest of a member of the family of the buyer, a guest of the buyer, or an employee of the buyer...." § 99B–2(b).[5] [Dkt. 102 at 14 (emphasizing that Allgood and Evans were cousins).] There are two problems with this argument. First, as already explained, the identity of the buyer is not known, so

---

[5] The entire provision reads: "A claimant who is a buyer, as defined in the Uniform Commercial Code, of the product involved, or who is a member or a guest of a member of the family of the buyer, a guest of the buyer, or an employee of the buyer may bring a product liability action directly against the manufacturer of the product involved for breach of implied warranty; and the lack of privity of contract shall not be grounds for the dismissal of such action." § 99B–2(b).

13

any claim that Allgood qualifies as a family member within the meaning of this exception necessarily fails. Second, § 99B–2(b) applies to manufacturers and as already explained CNA is not a manufacturer within the meaning of § 99B-1(2)(a). Therefore, summary judgment is granted on the implied warranty of merchantability claim.

### E. Motion to Exclude David Rondinone's Testimony

In connection with Allgood's common law negligence claim (Count Three), CNA seeks to exclude the testimony of Allgood's expert witness, David Rondinone, an engineer with Berkeley Engineering and Research, Inc. [Dkt. 100-1 at 123.] Rondinone examined exemplars and other documents and materials, and concluded, among other things, that: (a) the mechanical interlock design intended to lock the lid is defective in that it fails to perform its function. This conclusion is based on, among other things, the geometric dimensions of the pin, lid, and cooker, which results in the interlock "providing very little resistance to the user;" and (b) "the presence of a defective pressure interlock increases the likelihood of the lid being opened and the cooker contents being expelled under pressure." [Dkt. 101-1 at 137.]

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. This Rule provides that a qualified expert may opine on an issue relevant to a case where "the proponent demonstrates to the court that it is more likely than not that" (a) the expert's scientific, technical, or specialized knowledge will help the factfinder determine a fact in issue; (b) the expert's testimony is based on sufficient facts or data; (c) the expert used reliable principles and methods; and (d) the expert reliably applied those methods to the facts of the case. Fed. R. Evid. 702; *see also Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024).

The role of district courts in evaluating expert testimony is one of gatekeeping, "to ensure that any proposed expert testimony 'is not only relevant, but reliable.'" *Artis*, 95 F.4th at 525 (quoting *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993)). The district court must evaluate: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). Here, neither party cast doubt on Rondinone's qualifications. The court agrees that he is qualified to testify based on his engineering education, respective years of practical work experience, training, and other relevant credentials.

To determine whether proposed expert testimony is reliable, the court focuses "on the expert's methodology, not his ultimate conclusions." *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019). Four non-exhaustive considerations that bear on reliability include: (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether it has been evaluated in light of potential rates of error; and (4) whether the theory has found general acceptance within the relevant scientific or professional community. *Daubert* 509 U.S. at 593–94; *Gopalratnam*, 877 F.3d at 779–80. Finally, an expert's proposed testimony is relevant when it helps the factfinder "understand the evidence" or "determine a fact in issue." *Daubert*, 509 U.S. at 591. The court has "substantial latitude in making the findings necessary to fulfill this gatekeeping role." *Artis*, 95 F.4th at 525 (quoting *Von Durpin LLC v. Major Holdings, LLC*, 12 F.4th 751, 772 (7th Cir. 2021)).

With these principles in mind, the court turns to CNA's arguments in favor of exclusion. The touchstone of CNA's argument is that Allgood threw away the device's lid, so Rondinone could not test the actual multicooker Allgood used. [Dkt. 91 at 9.] The exemplar multicooker that Rondinone examined was used when it was purchased such that its prior history is unknown. CNA notes that the exemplar's lid had a pre-existing scratch that Rondinone concluded means the the lid was "force[d] open while under pressure by a prior user (an interlock override event)." [Dkt. 91 at 7.] CNA challenges the reliability of Rondinone's opinion that the device was defectively designed because the mechanical interlock system could not meet the Underwriters Laboratories Cover Opening Standard. According to CNA, Rondinone's methodology relies on broad generalizations and fails to account for whether the exemplar met relevant Underwriters Laboratories' standards before the exemplar was damaged. [*Id.* at 10.] In short, Rondinone's focus on "a single, damaged, non-representative exemplar improperly ignored or cherry-picked evidence" and is insufficient to withstand *Daubert* scrutiny. [*Id.* at 11.]

Allgood counters that Rondinone set forth his methodology in his report. [Dkt. 100-1 at 123–37.] He explained how he examined and measured the exemplar, including its interlock features, and considered relevant Underwriters Laboratories standards. He then concluded that the mechanical interlock design that is intended to lock the lid of the device is defective in that it fails to perform its intended function.

The court agrees with Allgood that Rondinone's conclusions are sufficiently reliable. Among other things, he explained how the exemplar he examined showed "linear defects in the coating which are consistent with wear from the lid locking pin

15

sliding over the tab," and that the pre-existing scratch on the lid he examined could be the result of the lid being opened under pressure despite the sliding pin lock being held in place by the float valve. [Dkt. 100-1 at 130.] His opinions are appropriately based on sufficient data, an examination of an exemplar, and a reliable application to the facts of this case. His testimony would also assist the fact finder with determining whether a defect existed at the relevant time, and the methodology underlying his conclusions is sound and sufficiently reliable for trial.

To the extent CNA wishes to challenge the facts forming the basis of Rondinone's opinions, including the impact, if any, that examining an exemplar had on his conclusions, it may do so on cross-examination. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or where appropriate, on summary judgment."); *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 847 (7th Cir. 2017). Although the facts on which an expert bases his opinion must have some basis in the record, there is no requirement that the basis must consist of undisputed evidence. *Sanders v. City of Chi. Heights*, 2016 WL 1730608, at *6 (N.D. Ill. May 2, 2016) ("[A]lthough an expert cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when forming his opinions.").

None of CNA's remaining arguments are persuasive. That Rondinone did not take measurements that CNA deems critical, failed to perform a statistical or comparative analysis, or reached his conclusions based on a "single nonrepresentative data point," are fair points for cross-examination. [Dkt. 91 at 14.] The impact of his answers—and ultimately whether his opinion is correct—is for the jury to decide. But they are not grounds for excluding his testimony or opinions.

\* \* \* \*

To establish a product liability action based on negligence, a plaintiff must show that "(1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of that standard of care; (3) injury caused directly or proximately by the breach, and; (4) loss because of the injury. *Ziglar v. Du Pont Co.*, 280 S.E.2d 510, 513 (N.C. Ct. App. 1981) (quoting *City of Thomasville v. Lease-Afex, Inc.*, 268 S.E.2d 190, 194 (N.C. 1980)). A plaintiff must present evidence that the product was in a defective condition at the time it left the defendant's control. Because Rondinone's testimony is admissible, there is circumstantial evidence of a

defect, including from his testimony concerning the scratch on the lid he examined. As such, Allgood's common law negligence claim, Count Three, remains for a jury to decide at trial. *Est. of Tipton by & Through Tipton v. Delta Sigma Phi Fraternity, Inc.*, 826 S.E.2d 226, 235 (N.C. Ct. App. 2019) (noting the "well-established principle that the issue of proximate causation is ordinarily left for the jury to decide.")

## IV. Conclusion

CNA's motion for summary judgment is granted as to Allgood's inadequate design, failure to warn, and breach of express and implied warranty claims. It is denied as to Count Three.

Enter: 23 CV 462
Date: September 3, 2025

_____
Lindsay C. Jenkins
United District Court Judge